**In re Eugene B. LEEDY, Debtor.**

**Bankruptcy No. 98–15257–SSM.**

United States Bankruptcy Court,
E.D. Virginia,
Alexandria Division.

Jan. 12, 1999.

Robert K. Coulter, Assistant United States Attorney, Alexandria, VA, for IRS.

Thomas F. DeCaro, Jr., Upper Marlboro, MD, for debtor.

Gerald M. O'Donnell, Alexandria, VA, Chapter 13 Trustee.

### MEMORANDUM OPINION

STEPHEN S. MITCHELL, Bankruptcy Judge.

This matter is before the court on the debtor's objection to the claim of the Internal

Revenue Service ("IRS"). At a scheduled hearing on December 4, 1998, the parties restricted their argument to a single legal issue and requested a later hearing for presentation of evidence concerning the value of the debtor's personal property. Accordingly, the court treats the present matter as being in the nature of a motion for partial summary judgment. The precise issue presented—which appears to be one of first impression—is whether, for the purpose of bifurcating a partially-secured claim into its secured and unsecured components, the "value" of a tax-deferred retirement account should be discounted to reflect the tax consequences that would flow from withdrawal of the funds. For the reasons stated, the court concludes that it should not.

### Background

Eugene Leedy, an international transportation consultant, filed a voluntary petition under chapter 13 of the Bankruptcy Code in this court on July 14, 1998. Relevant to the present discussion, he listed among his assets a $13,000 interest in a 401(k) retirement savings plan sponsored by his employer, Burdeshaw Associates. That interest is claimed exempt under Va.Code Ann. § 34–34. On July 28, 1998, the debtor filed a proposed chapter 13 plan to which the chapter 13 trustee, the Virginia Department of Taxation, and the IRS have objected.[1]

On September 10, 1998, the IRS filed a timely proof of claim (Claim No. 3) in the amount of $138,064.10, of which $47,103.00 is asserted as a secured claim,[2] $68,692.14 as a priority unsecured claim, and $22,268.96 as a general unsecured claim. The debtor filed an objection to the claim on September 22, 1998, taking the position (a) that only $14,623.00 of the IRS's claim was secured, that being the alleged "net asset value" of the property subject to the IRS's filed lien; and (b) that the taxes for the 1994 tax year (in the amount of $18,959.77) were not a priority claim.[3] The IRS, in its response, has conceded that the unpaid 1994 taxes are not entitled to priority. At the hearing, the IRS also conceded that the debtor's real estate is held as tenants by the entirety[4] and is not subject to the Federal tax lien that was filed against the debtor alone; however, the value and ownership of the debtor's personal property remains in dispute.

### Discussion

The only issue presently before the court and not reserved for further hearing is whether, in applying § 506(a), Bankruptcy Code, to a retirement savings plan encumbered by a tax lien, and which the debtor proposes to retain, the "value" of the taxing authority's interest in the account is simply the dollar value of the account on the date the bankruptcy petition is filed, or whether that amount should be reduced by the tax consequences of withdrawal.[5]

1. Under the plan, the debtor would pay the chapter 13 trustee $1,708.43 a month for 36 months. From those funds the trustee would pay his own statutory commission, $53,911 in scheduled priority tax claims to the IRS and the Virginia Department of Taxation, and a 5% dividend on unsecured claims. The plan does not provide for the surrender or liquidation of the 401(k) plan and does not treat the IRS—or, for that matter, the Virginia Department of Taxation, which also filed a claim asserting to be partially secured—as a secured creditor. Since the debtor now concedes that the IRS is secured in some amount (even if that amount is disputed), the plan will clearly have to be modified. For the purpose of this opinion, the court assumes that any modified plan will treat the IRS's secured claim by making deferred payments having a present value equal to the value of its collateral, as permitted by § 1325(a)(5)(B), Bankruptcy Code.

2. The secured claims relate to 1991 and 1992 individual income tax. The proof of claim represents that the notice of Federal tax lien was filed on December 31, 1996, with respect to the 1991 taxes, and on September 10, 1997, with respect to the 1992 taxes.

3. The debtor also stated in his objection that the claims relating to the 1990, 1991, and 1992 tax years were "contested" by the debtor, but that the debtor would file a separate adversary proceeding under § 505, Bankruptcy Code, to determine the amount of those taxes.

4. The property is valued on the debtor's schedules at $303,000.00, and is shown as being subject to a deed of trust upon which there is due $279,000.00.

5. As originally framed, the debtor's argument solely addressed the tax consequences attendant upon early withdrawal. At oral argument and in a post-hearing memorandum, however, the debtor urged that the tax burden of the normal with-

The debtor does not dispute that the IRS's filed tax lien attaches to his interest in the 401(k) plan, and the IRS apparently does not dispute the debtor's representation that the balance in the plan on the filing date was $13,000.00.[6] The IRS also does not dispute the debtor's assertion that early withdrawal would trigger both a 10% early withdrawal penalty as well as Federal and state income taxes, at the debtor's marginal tax rate, on the amounts withdrawn. The IRS does not, however, concede the debtor's assertion that his marginal tax rate would be 31% for Federal income tax and 5.75% for Virginia income tax. For the purpose of the present ruling, therefore, the court assumes only that Federal and state income tax would be due in some amount.

### A.

Although styled as an objection to claim, what the debtor essentially seeks is a determination of the value of the retirement account and a bifurcation of the claim secured by the tax lien into secured and unsecured components.[7] Outside of bankruptcy, a secured creditor is entitled to retain a lien against property securing a claim until the claim is paid in full. In bankruptcy, however, the rule is different. Under section 506(a), Bankruptcy Code,

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim *to the extent of the value of such creditor's interest in the estate's interest in such property* ... and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. *Such value shall be determined in light of the purpose of the valuation* and of the *proposed disposition or use of such property,* and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

(Emphasis added). Thus, a creditor whose claim is secured by property which is worth less than the amount of the debt is treated as being secured only to the extent the value of the collateral, and the remainder of the claim is treated as unsecured. Moreover, the lien, to the extent it exceeds the value of the collateral, is void. § 506(d), Bankruptcy Code.[8] Unless a chapter 13 plan provides for surrender of the collateral, the plan must pay the creditor the value of the collateral in full, with interest. § 1325(a)(5)(B), Bankruptcy Code. The unsecured portion of the claim, however, is not required to be paid in full, so long as the plan is proposed in good faith, creditors receive at least as much as they would in a chapter 7 liquidation, and the debtor pays into the plan all of his or her disposable income for three years. §§ 1325(a)(3), (a)(4), and (b)(1), Bankruptcy

---

drawals that would occur after he reached retirement age was also relevant.

**6.** Since the Virginia Department of Taxation has also filed a proof of claim as a secured creditor, there is likely to be a question of priority, since, at least on the present sketchy record, it seems probable that the value of property to which the competing tax liens attach will be less the total amount of taxes for the years in question. Since there is no evidence before the court as to when the Virginia Department of Taxation filed its liens, and since the Virginia Department of Taxation has not been made a party to the present objection, the court intimates no view on that issue.

**7.** A challenge to a creditor's claimed valuation of its collateral would appear to be more appropriately raised by a motion under Fed.R.Bankr.P. 3012 to value the collateral than by an objection to claim under Fed.R.Bankr.P. 3007. However, the IRS has not objected to the procedural path taken by the debtor, and accordingly the court will treat the debtor's objection to claim as including by implication a request for valuation of collateral under § 506(a), Bankruptcy Code, and Fed.R.Bankr.P. 3012

**8.** This is subject, however, to two important qualifications. First, a claim secured only by a security interest in an individual debtor's principal residence cannot be bifurcated in chapter 13 or 11. §§ 1322(b)(2) and 1123(b)(5), Bankruptcy Code; *Nobelman v. American Savings Bank,* 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993); *but see Wright v. Comm'l Credit Corp.,* 178 B.R. 703 (E.D.Va.1995), *appeal dismissed* 77 F.3d 472 (4th Cir.1996) (wholly unsecured mortgage can be stripped off in chapter 13). Second, a chapter 7 debtor cannot use § 506(d) to "strip down" a lien to the value of property retained by the debtor. *Dewsnup v. Timm,* 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992); *but see In re Yi,* 219 B.R. 394 (E.D.Va.1998) (chapter 7 debtor may strip off wholly unsecured lien).

Code. The combined effect of §§ 506(a) and 1325(a)(5)(B) is to allow the debtor to redeem the collateral over time by paying the creditor the value of the collateral, even if that is considerably less than the amount of the debt, a treatment commonly, if inelegantly, referred to as "cram down."

### B.

The debtor contends that the tax costs of withdrawing funds from his 401(k) plan should be deducted for the purpose of determining the "value" of the account, and, hence, the IRS's secured interest in the account. What is meant by "tax costs" are the 10% penalty for withdrawals which do not satisfy the requirements set forth in 26 U.S.C. § 72(t), as well as income taxes on any distributions made under the retirement plan. In opposition, the IRS cites to *Brown & Co. Securities Corp. v. Balbus (In re Balbus)*, 933 F.2d 246 (4th Cir.1991) and *Coker v. Sovran Equity Mort. Corp. (In re Coker)*, 973 F.2d 258 (4th Cir.1992) and argues that tax consequences, like hypothetical costs of sale, are not to be deducted in determining the extent to which a creditor is secured under § 506(a), Bankruptcy Code, when the debtor proposes to retain the collateral.

In *Balbus*, the creditor sought to dismiss the debtor's case on the ground that the amount of his unsecured debts made him ineligible for chapter 13 relief. The issue was how to value the debtor's real property under § 506(a), Bankruptcy Code, in determining the amount by which the mortgage holder was undersecured. The creditor argued that the hypothetical costs of sale should be deducted from the fair market value of the property in order to arrive at the amount of the secured debt.[9] After reviewing the case law from other jurisdictions, the Fourth Circuit concluded that the value of the real property was not to be reduced by such costs. *Balbus*, 933 F.2d at 251–52. In construing § 506(a), *Balbus* focused on the second sentence, which requires that "value must be determined in light of the *purpose of the valuation and of the proposed disposition or use* of such property" (emphasis add-

ed). With respect to the first factor, the court explained that the purpose of the valuation was to determine whether the debtor met the debt eligibility limitations set forth in § 109(e), Bankruptcy Code. Because the determination of hypothetical costs of sale introduces the possibility of manipulating the eligibility requirements, the court believed that allowing the deduction of the costs would lead to inconsistent interpretations of § 109(e). *Balbus* then looked to the "proposed disposition or use" of the real property. Since the debtor did not intend to sell the property, the court reasoned, "There is no need to subtract the hypothetical costs of sale as they are just that—hypothetical." *Id.* at 252.

The Fourth Circuit again addressed the issue of hypothetical costs in *Coker*. There, the debtors moved to avoid the lien of a junior deed of trust under § 506(a). Holding that *Balbus* controls, the court did not permit the debtors to deduct the hypothetical costs of sale from the value of their residence. After noting that the purpose of the valuation was to determine the "extent of the value of the creditor's interest in the estate's interest in the property," § 506(a), Bankruptcy Code, the court turned to the debtors' intention to retain their home and explained:

> Chapter 13 is a reorganization mechanism for individuals. One of its advantages to the homeowner debtors is that they may retain their home by reaffirming the mortgage debt. Were we to permit the deduction of hypothetical sale costs in the face of the Cokers' stated intention, an intention that is subject to the bankruptcy court's approval, we would create an anomalous situation indeed. On the one hand, the debtors have submitted their plan, which includes a pledge to continue their mortgage payments in full. If this pledge is carried out, the mortgagees will obtain full value of their bargained-for security interests. On the other hand, the Cokers want the court to value Sovran's claim as if the very event that Chapter 13 permits them to avoid has occurred, i.e., a foreclosure. If the "proposed use or disposition" provi-

---

9. If those costs were deducted, the unsecured portion of the claim would have increased the total amount of unsecured debt owed by the debtor to a point exceeding the jurisdictional limit for unsecured debt allowed in chapter 13 by § 109(e), Bankruptcy Code.

sion is to have any meaning, the debtor should not be permitted to "eat with the hounds and run with the hares." *In re Crockett*, 3 B.R. 365, 367 (Bankr.N.D.Ill. 1980).

*Coker*, 973 F.2d at 260.

Both parties have cited to *Associates Comm'l Corp. v. Rash*, —— U.S. ——, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997), a recent Supreme Court decision interpreting § 506(a), Bankruptcy Code, in the chapter 13 context. *Rash* is not directly on point, since the issue of deducting costs was not before the Court, but the opinion does provide some guidance. The debtor's chapter 13 plan in *Rash* proposed to retain a truck by invoking "cram down" under § 1325(a)(5)(B), Bankruptcy Code. The Court held that "replacement value"—which the court defined as "the price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller"—is the appropriate standard for valuing property under § 506(a) where the debtor proposes to retain the secured creditor's collateral. *Id.* at ——, ——, 117 S.Ct. at 1884, 1886. The debtor in *Rash* had argued that what the secured creditor would realize in a foreclosure is the proper standard for valuing property under § 506(a). The Court rejected the debtor's position, noting that the emphasis should be placed on the "proposed or disposition or use" language in the second sentence of § 506(a). "Tying valuation to the actual 'disposition or use' of the property points away from a foreclosure-value standard when a Chapter 13 debtor, invoking the cram down power, retains and uses the property." *Id.* at ——, 117 S.Ct. at 1885.

## C.

Neither party has cited the court to a case specifically addressing, in the context of applying § 506(a), the deduction of tax costs that would be incurred in connection with the liquidation of the secured creditor's collateral, and the court's own research has uncov-

ered no relevant authority. Although *Coker* and *Balbus* specifically addressed direct transactional costs (such as real estate broker commissions), the same reasoning would nevertheless lead to the conclusion that the indirect "tax costs" of withdrawing funds from the 401(k) plan should likewise not be subtracted for the purpose of valuing the secured creditor's interest under § 506(a). By allowing the debtor to deduct tax costs, the court would be permitting the same "anomalous situation"—certainly with respect to the 10% early-withdrawal penalty—that *Coker* sought to avoid. That is, the debtor would get the considerable benefit of treating the unsecured portion of the claim as though a liquidation had occurred,[10] while at the same retaining the property and not actually having to pay those costs.

It is true, as the debtor argues, that *Coker* and *Balbus* are not strictly analogous, since they do not address the unique characteristics of a 401(k) tax-deferred retirement plan. While the 10% early-withdrawal penalty is a transactional cost of liquidation like a real estate broker's commission, payment of income taxes on the withdrawals, whether now or later, is not. That is, taxes are paid on withdrawals from a 401(k) plan whether those withdrawals occur prematurely or in the ordinary course after the debtor reaches retirement age.[11] The "proposed use" of a tax-deferred retirement savings account, the argument goes, always contemplates an ultimate withdrawal of the contributed funds, with attendant triggering of tax liability.

There are three reasons why the court does not find this argument to be persuasive. First, it flies in the face of the "replacement value" standard articulated in *Rash.* A debtor, faced with the need to replace a retirement account containing $100, would have to pay $100 to fund a like account. Second, the amount of taxes that would be due upon ultimate withdrawal of funds from a 401(k) plan after the debtor reaches retirement age is highly speculative. The whole point of a

---

10. In the present case, that benefit is quite dramatic, since the debtor's plan proposes to pay unsecured claims at only 5 cents on the dollar.

11. *See Eagan v. United States*, 80 F.3d 13, 15 (1st Cir.1996) (taxation was deferred on portion of employee's compensation contributed to 401(k) plan and on any income earned on those contri-

butions, "but tax would eventually be due when [the taxpayer] withdrew funds from the plan[.]'"); *Donald H. Hartvig, Inc. v. Kellas (In re Kellas)*, 113 B.R. 673, 680 (D.Or.1990) ("In a 401(k) account, the employee pays tax on withdrawal of the funds.").

tax-deferred retirement savings plan is that income taxes on the funds contributed and on the gains realized are postponed until retirement years when one is likely to be in a lower tax bracket. Depending upon a particular taxpayer's economic situation (including, for example, loss carry-forwards), there might be very little or no taxation of the withdrawals. Finally, allowing a deduction for the taxes that will have to be paid someday—even assuming it were possible to calculate that amount with any confidence—would place the holder of a tax-deferred retirement account in an anomalous position compared with the owner of, say, an automobile or any other asset purchased with after-tax dollars. If a taxpayer in, for example, a 28% marginal tax bracket needed to buy an automobile, he or she would have to earn approximately $139 before taxes for each $100 used to purchase the automobile. The tax bite in no sense reduces the value of the automobile, and there is no more reason to take it into account simply because it is deferred and is incurred *after* rather than *before* the purchase.

This is not to say that consideration of adverse tax consequences from liquidation of collateral would never be appropriate in chapter 13. For example, one of the requirements for plan confirmation is that

> the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date[.]

§ 1325(a)(4), Bankruptcy Code. This requirement is commonly referred as the "best interests of creditors test" or the "liquidation test." Several courts have held that in applying the liquidation test the court must take into consideration any anticipated costs of sale and tax gains that would be payable by a chapter 7 trustee. *See, e.g., In re Gatton,* 197 B.R. 331, 332, (Bankr.D.Col. 1996). Such costs are deducted since the court must determine how much the creditors would *actually* be paid in a chapter 7

liquidation. Here, in contrast, an adjustment is inappropriate because the focus, under *Rash,* is not on the amount the IRS would receive, but rather on the benefit to the debtor, as measured by what it would cost the debtor to replace the account.

A separate order will be entered consistent with this opinion determining that the "value" of the debtor's 401(k) plan, for the purpose of applying § 506(a), is the amount in the account on the date the debtor's petition was filed,[12] without adjustment for the tax consequences attendant upon withdrawal, whether early or otherwise, of funds from the account.

---

**12.** The IRS's lien attaches also to interest or profits earned post-petition on those funds, but not to any funds paid into the account from the debtor's post-petition earnings. *See Connor v.*

*United States (In re Connor),* 27 F.3d 365, 366 (9th Cir.1994) ("Although the reach of [a Federal tax lien] is very broad, it does not apply to property acquired after bankruptcy.").